FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

03 MAR 18 AM 9: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

STEVE OREL,                                    )
                                               )
      Plaintiff,                      )
                                               )
vs.                                            )          CV 00-B-3180-S
                                               )
BIRMINGHAM   BOARD   OF                        )
EDUCATION; et al.,                             )
                                               )
      Defendant.                      )

ENTERED

MAR 18 2003

## MEMORANDUM OPINION

    This case is presently pending before the court on defendants' Motion for Summary

Judgment. (Doc. 25). Plaintiff, Steve Orel, filed suit against defendants – Birmingham Board

of Education, Johnny E. Brown, Peggy Sparks, Wanda M. Minor, and Louise Cooley –

alleging that they had terminated him and had otherwise retaliated against him for engaging

in speech protected by the First Amendment.   (Doc. 1.)  Defendants deny plaintiff's

allegations and seek summary judgment on all claims against them.

    Upon consideration of the record, the submissions of the parties, and the relevant law,

the court will grant defendants' Motion for Summary Judgment, (doc. 25), and dismiss

plaintiff's claims.

## I. SUMMARY JUDGMENT STANDARD

    Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record

shows "that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the



initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. <u>STATEMENT OF FACTS</u>

In 1996, plaintiff Steve Orel began work as a part-time instructor in the adult education program hosted by the Birmingham Board of Education. (Doc. 27, Ex. 3 ¶ 5(d).) He held this position for approximately two years. (Doc. 26, Ex. 33 ¶ 6.) In May or June of 1998, plaintiff became a workplace specialist. (Doc. 26, Ex. 25 at 62.) On October 4, 1999,

2

plaintiff signed an employment agreement for the 1999-2000 school year (September 1, 1999 until May 31, 2000). (Doc. 27, Ex. 5.) This agreement was not renewed for the 2000-2001 school year. (Doc. 27, Ex. 7.)

In 1999, the Alabama Department of Education created its Adult Education and Family Literacy Plan, which was approved for funding under the Workforce Investment Act of 1998. (Doc. 27, Ex. 23 at 1.) As part of its plan, federal and state funds were used by providers of adult education programs to provide adult education classes and family literacy services. (*Id*. at 24-25.) Adult education programs are "hosted" by entities such as local boards of education, churches, and colleges. (Doc. 26, Ex. 29 at 13-14.) The Birmingham Board of Education is one of the hosts for adult education programs in Jefferson County. (*Id*. at 14; doc. 26, Ex. 33 ¶ 13.) The Board receives federal and state funding for its program, and it operates the program under strict guidelines established by the Alabama Department of Education. (Doc. 26, Ex. 29 at 13.) Defendants contend the Board employed only three people working in its adult education program: Wanda Minor, Coordinator; Minor's secretary; and Regina McFadden, the administrator in charge of the Macoy site. (Doc. 26, Ex. 35 ¶ 5; Doc. 36, Ex. 43 at 18.) Defendants contend that all other people working for the program, including plaintiff, were not employees of the Board; rather, they were employees of the program.[1]

---

[1]For reasons set forth below, the court does not reach the issue of whether plaintiff was an employee of the Board of Education.

The target population of the Board's adult education program's includes "[i]ndividuals 16 years of age or older, not in school and not required to be in school by state law; and who have not earned a high school diploma or its equivalent; and/or do not perform at a level equal to or greater than the 12.9 grade equivalency." (Doc. 27, Ex. 23 at 5.)  The program provides adult literacy instruction, GED preparation, and training in certain work skills. (Doc. 26, Ex. 33 ¶ 26; doc. 27, Ex. 7.)  During the relevant period, the program had approximately 62 class sites and employed approximately 48 employees.  (Doc. 26, Ex. 35 ¶ 18.)

The Coordinator of Adult Basic Education Program, defendant Wanda Minor, was responsible for hiring and firing the program's employees.  (Doc. 26, Ex. 33 ¶¶ 7-11.)  She did not consult with, seek approval of, or obtain input from anyone with regard to hiring and termination decisions for the program's employees. (*See id.*; doc. 26, Ex. 33 ¶¶10-12.)  She reported to defendant Peggy Sparks, who was the Executive Director of the Parent and Community Support Program.  (Doc. 36, Ex. 48 at 13-14.)

Plaintiff's 1999-2000 employment agreement set forth his minimum work requirements for that academic year. (*See* doc. 27, Ex. 5.)  Specifically, he was expected to work 30 hours a week and generate a minimum of 300 student contact hours per week/1200 hours per month.  (*Id.*)  The agreement also listed plaintiff's job responsibilities, which included:

- Prescribe individual instruction to meet students' needs.
- Maintain discipline in a consistent and equalitarian fashion.
- Utilize a variety of instructional methods to meet the needs of students.

4

- Report monthly attendance and academic progress records and statistical data.
- Identify support services needed by student and make appropriate referral.
- Prepare and maintain all written reports on students.
- Compile quarterly reports of each student's progress and interpret for student and/or significant other.
- Follow-up and make appropriate referral in cases where students fail to return.
- Diagnose, interpret, and administer test to determine student's level of functioning.
- Participate in all in-Service and Professional Development workshops including summer adult education conference and state incentive Grant program.
- Other duties as prescribed by the Alabama State Adult Education Plan, Section 224(b)(2) Adult Education Teachers (pp 35-40.)[2]

(*Id.* at 5 (footnote added).)

Defendant Louise Cooley was plaintiff's immediate supervisor. (Doc. 26, Ex. 25 at 66-67.) In April 2000, Cooley prepared an evaluation of plaintiff's work performance for the 1999-2000 academic year. (Doc. 27, Ex. 6; doc. 26, Ex. 34 ¶ 23.) On the evaluation, plaintiff received "marginal" ratings for punctuality;[3] accomplishing curriculum objectives expected for grade level;[4] maintaining and submitting accurate and complete records;[5] and

---

[2]*See* doc. 27, Ex. 23 at 41-45 (duties and responsibilities of "teachers").

[3]Cooley noted, "Steve is punctual for his classes, but he misses deadlines for reports, paperwork, and class completion dates." (Doc. 27, Ex. 6.)

[4]Cooley noted, "Measurable results are not always provided." (*Id.*)

[5]Cooley noted that plaintiff had "not adhered to standardized record keeping practices." (*Id.*)

upholding and enforcing school rules and regulations.[6] (Doc. 27, Ex. 6.) Plaintiff received an "unsatisfactory" rating for cooperation.[7] (*Id.*) Specifically, Cooley evaluated plaintiff's work performance in the manner set forth above because he was late with his monthly reports,[8] he failed to provide "measurable results,"[9] he created his own forms for record-keeping purposes,[10] he took action without getting Minor's prior approval,[11] and he "grilled" Cooley regarding suggested changes to his curriculum.[12]

Plaintiff admits that he missed deadlines for his paper work and that he did not generate the minimum number of contact hours required by his agreement. (Doc. 26, Ex. 25 at 77, 81-82.) Plaintiff and others had been warned that lack of contact hours or students could jeopardize the continuation of the class and, thus, their jobs. (Doc. 26, Ex. 26 at 32.)

On April 18, 2000, plaintiff met with Cooley and Minor – at his request – to discuss his evaluation. (Doc. 26, Ex. 25 at 89-90; *see also* doc. 36, Ex. 43 at 213.) At the evaluation conference, Minor informed plaintiff that she agreed with Cooley's evaluation of his work

---

[6]Cooley noted "[Plaintiff] [d]oes not generate the student hours required by Employee Agreement." (*Id.*)

[7]Cooley noted, "[Plaintiff] [g]oes beyond authorized guidelines." (*Id.*)

[8](Doc. 26, Ex. 26 at 23-25.)

[9](*Id.* at 25-26.) Cooley testified that plaintiff did not provide information that he had given required tests so that a student's performance could be evaluated and recorded. (*Id.*)

[10](*Id.* at 29.)

[11](*Id.* at 38-40.)

[12](*Id.* at 46.)

6

performance. (Doc. 26, Ex. 27 at 216.)  Plaintiff was reminded of the requirements in his employment agreement and that the agreement, by its terms, ended on May 31, 2000. (*Id.* at 223.)

After his evaluation, plaintiff was concerned about his job security. (Doc. 26, Ex. 25 at 88.) He testified, "I think I told Ms. Minor and Ms. Cooley together that this isn't – you know, this isn't a good job evaluation and that I felt it would hurt my, you know, chances of getting hired." (*Id.*)

On May 25, 2000, plaintiff submitted a paper in a graduate-level college class he was taking at the University of Alabama at Birmingham [UAB]. (*See* doc. 27, Ex. 9.)  The paper contained pictures of students from his class and redacted school records of these students. (*Id.*, Exs. A, C, and E.)  In this paper, plaintiff stated that a large number of students in Birmingham high schools had been forced to drop out in order to raise standardized test scored. (*Id.* at 2-3.) He wrote:

> In the months and weeks preceding the Spring, 2000, administration of the SATs, some local public school administrators apparently succumbed to the tremendous pressure with a knee-jerk reaction to the dilemma of improving SAT achievement test scores and kicked many students out of school. Specific populations of the student body were targeted as the culprits for low scores and discarded like waste. . . . Reportedly, hundreds of students were expelled or "withdrawn" [in the ] months and weeks leading up to the administration of the SAT tests. Some unsubstantiated reports indicate that possibly 100-140 students were withdrawn from one local high school alone. Mass, wholesale "withdrawals" (i.e.: expulsions) were issued to students as young as 16. These students were barred from the school classrooms and left to fend for themselves on the streets. The reason provided for most of these withdrawals was, "lack of interest," and this was based upon the poor attendance habits of these students.

(*Id.*)

No citation is provided for this assertion. (*See id.*)  His paper does include citations

to the unsworn statements of two unidentified students,[13] unidentified "information available

from author but withheld for job security purposes,[14] an unproduced "incident report" from

a "Birmingham City School Instructor,"[15] an undocumented interview with an unidentified

Board member,[16] and an undocumented "[i]nterview by author with expelled students."[17]

_____

[13](See doc. 27, Ex. 9, Term Paper at 3 n.5 & App. Ex. D and Term Paper Follow-up at 3 n.8 & App.)

[14]Plaintiff stated that this information was withheld because, "One can only tolerate so much heat at one time."  (*Id.* Ex. 9 at 16 n.32.)

[15](*Id.* at 4.)  The incident report, as quoted, states:

> Last week, I received a phone call from a young woman who said she was calling in behalf of her friend, WT (a student in our program), who could not make it to school that day because of an "emergency."  I inquired further and learned that WT was walking to our program (she had recently been "withdrawn" from her local high school in the weeks leading up to the SATs) and was jumped, beaten-up, and robbed of her jewelry.  I extended my sympathies to WT and told the caller we would look forward to her coming back to school when she felt better.  The significance of the call dawned on me only after I hung up the phone.  In the middle of this horrible and traumatic incident, WT had maintained her bearings enough to instruct a friend to call the school and explain what happened so that she would not be expelled or withdrawn again.  In WT's file folder, I have a simple slip of paper which described WT a having a "lack of interest," but before my eyes I have a conscientious student who is trying to pick herself back up on her feet, and is struggling to continue her education.  Something does not match up.  Something has gone drastically awry.

(*Id.* (citing "Incident report regarding WT by Birmingham City School instructor, April 18, 2000").)

[16]According to plaintiff's paper, the Board member was not identified "due to the political storm that is brewing regarding this issue."  (*Id.* at 9 n. 15.)

[17](*Id.* at 6 n.10.)  The court also notes that none of the students were "expelled"; rather, these students were classified as having withdrawn or dropped out of school.

Plaintiff testified in his deposition that his assertion set forth in his paper was "based on [a] very small sampling" of withdrawn students that had enrolled in his adult education class. (Doc. 26, Ex. 25 at 191.) According to the record before the court, plaintiff had less than ten students enrolled in his program that were withdrawn from high school in Spring 2000. (Doc. 27, Ex. 8, Attachments (Enrollment Data for MWW).) He also testified that he had conducted interviews with his students, ages 16-18, without prior parental consent, (doc. 26, Ex. 25 at 144-45), which is a violation of the Board's Guidelines for Conducting Research in the Birmingham City School District, (doc. 27, Ex. 10), and federal law, *see* Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.. He did not review any records except the withdrawal slips that students had given to him. (Doc. 26, Ex. 25 at 190-91.) He did not receive permission for the Board to use any of the redacted student documents in his paper, (*id.* at 149), which is a violation of the Board's Guidelines for Conducting Research in the Birmingham City School District, (doc. 27, Ex. 10 ), and federal law, *see* 20 U.S.C. § 1232g.. He did not question school administrators or teachers, the parents of withdrawn students, or withdrawn students that were not enrolled in his class. (Doc. 26, Ex. 25 at 144, 162-63, 183.)

Plaintiff gave his term paper to Board Member, Virginia Volker. (Doc. 26, Ex. 25, at 141-42.) Volker raised plaintiff's allegations in a Board meeting. (*See* Doc. 27, Ex. 11.) Also, the allegation in plaintiff's term paper was reported in a Birmingham newspaper. Subsequently, parents and school officials came to a Board meeting for purposes of defending the schools accused of withdrawing students in order to raise standardized test

scores.  The comments at the Board meeting emphasized a continuing concern that the allegation of cheating to raise scores detracted from the work that students and teachers at Birmingham City Schools had done to raise standardized test scores in legitimate ways.  (*See generally id.*, Attach. (Minutes frm June 16, 2000, Board Meeting).)

At this meeting, Rev. Larry D. Coleman, then President of the Board, stated:

> [A] statement was put out the other day concerning [a] great tragedy in our school system.  The press has reported on this and they say that students were withdrawn and the reason they were withdrawn was because of their lack of interest and school administrators told many students that they could not return until after the test.  I, as the Board President, was appalled to call us or to say that our administrators cheated and our teachers cheated.  . . .  It is strange that this document that was put in the paper said this is cruel and unethical and not in keeping with our policy of educating all students.  What was done here [the public allegation of cheating] was unethical; it was cruel.  It really bothered me because it was not done in proper protocol.  . . . It is bad to say that these people here are busting their behinds to turn this school system around and then to turn around and call them cheaters; I am appalled and I am hurt about it.
>
> For twenty something odd years our schools have been below [the] national average.  . . .  Administrators, teachers, and everybody are working hard, working late in the evenings helping our children.  Then you are going to turn around and call them a cheater.  That is wrong, everybody in here know[s] it is wrong.  . . .  We made it from academic caution to academic clear; people are working hard trying to straighten out bad situations and then we turn around and call them cheaters.  That is wrong.  I don't care what [anybody] says, it is wrong. . . .  For years, people said, Birmingham and all the inner-city schools are low and poor performing and now we are trying to reach the national average and then you are going to call us cheaters.  That is wrong and I mean it is wrong.

(*Id.* at 12-13.)

Board Vice-President, Annie T. Davis, commented on the fact that the "UAB student" had gone into school files.  (*Id.* at 14.)  She stated, "[O]ur children are supposed to be

protected by law and we sit there and exploit them just to get us put into the paper." ( *Id.* at 14.) The principal of Wenonah High School, Sidney Moore, stated, "I'm hearing from my teachers, they are very upset about some of the allegations that we are hearing." (*Id.* at 19.)

Defendant Dr. Johnny Brown, Superintendent of the Birmingham City Schools, called a meeting of the principals of Birmingham City High Schools to discuss the withdrawal of students. He also reviewed data, in his words "to ascertain . . . as best we could where something like that might come from . . ., why a question like that would be raised." (Doc. 36, Ex. 44 at 30-31.) As a result of this meeting, he asked Dr. Abbe Boring, Deputy Superintendent for Instruction, to conduct an investigation to "determine why a question like that would be raised." (*Id.* at 31.)

Dr. Boring conducted an investigation and found that the allegation in plaintiff's paper that students were withdrawn to raise standardized test scores was unfounded. (Doc. 27, Ex. 11 at 11.) She stated in her report:

> What we found as we have looked at individual cases is that, in some cases, individual student comments were quite different from those initially indicated in the term paper. Principals, some students, and some parents have provided a different perspective regarding their withdrawal than the perspective shared in the term paper.

(*Id.* at 6.) She also noted that the total number of withdrawals for lack of interest was actually *down* from previous years: 625 in 1997-1998, 531 in 1998-1999, and 522 in 1999-2000. (*Id.* at 4.) She also noted that "lack of interest" did not equate with a lack of academic achievement; she found that about half of the students withdrawn from Phillips High School for lack of interest performed at or above the national average on the 1999 standardized test.

11

(*Id.* at 3.)  She found, "Based on this review, ***there is no data or evidence that would verify or lead to any conclusion that the allegations that students were withdrawn from high schools in early spring to prevent them from taking the SAT 9 are true***."  (*Id.* at 11 (emphasis added)).

Minor conducted a separate investigation using plaintiff's records.  (Doc. 26, Ex. 27 at 199.)  She concluded that plaintiff's allegations were false and not supported by his own records.  (*Id.* at 201.)  Referring to plaintiff's allegations, Minor testified that she told Dr. Brown, "[I]f Steve had really looked at his record, his own records, he could not have come up [with his] conclusion."  (*Id.*)

After its independent investigation, the Alabama State Department of Education also concluded that "there was no evidence to support the allegation that students were withdrawn based on low test scores."  (Doc. 27, Ex. 12.)

On July 26, 2000 Minor officially informed plaintiff that she would not renew his employment agreement based on his monthly reports and lack of a college degree, among other things.  (Doc. 27, Ex. 7.)  The letter notifying plaintiff of the non-renewal of employment agreement stated:

> First, let me thank you for the services you have provided to the Birmingham City Schools Adult Education as a part-time instructor for two years, a part-time salaried local workplace specialist with the Alabama Partnership Training Program approximately one year, and a full-time adult education instructor for nine months.  Having evaluated the class at Miller Wire Works (MWW) this past year, **it is my sad duty to inform you that your services as an adult education instructor will not be needed this coming program year**.  I have reviewed every monthly report that you turned in for the class at MWW, including contact hours generated and the time/hours spent teaching/working

12

with students.  Based upon those reports and the bottom-line of students' performance at MWW **a position** for you **is not included in the 2000-2001 adult education program's budget**.

Below is a summary of your monthly reports:

- Of the 30 hours per week you were paid to work with students, you averaged 6 hours per week with students.
- Of the 300 contact hours you were required to generate each week, your class averaged less than 130 per month.  Far short of the 300 required weekly and 1200 contact hours you should have generated each month. [sic]
- For the 7 months you were at MWW in a salaried position being paid for 30 hours per week, your class generated a total of 1007 contact hours far short of the 8,000+ it should have generated. Actually, the total contact hours generated by your class (WIRED) did not equal to one month's worth of work.
- Even though more than 100 students signed up to attend the MWW class, the average daily attendance (with the class meeting three days per week, two hours each day) was 5.8 and only 22 of the 112 students generated enough contact hours to be counted.  (As you know, students needed to attend at least 12 hours and [have] completed applications before they can be counted.)
- 41 days out of the less than 100 days you were at MWW you had no students present.  However, you were paid to work with students 5 days per week for 6 hours per day.

The state now requires us to be more accountable for students' progress and attendance and stricter requirements for persons selected to teach in adult education programs.  Not only will we have to be more accountable, we will also receive a Report Card based on program performance.  As much as I sympathize with you for wanting a teaching job in adult education, professionally I cannot justify continuing your position as an instructor with the program.  Not only [were] there insufficient contact hours and students served to justify your position (in salary and benefits we paid you more than $26,000), but also you do not have a degree plus the area where you can make the most contribution **(teaching welding) is not adult education**.  Workplace-specific instruction is no longer a focus of adult education.  In fact, the State Department of Education Adult & Community Program has eliminated the entire area of workforce development/work-specific training.  The Workforce

13

Investment Act now limits what we can do with adult education programs funded by federally (pass-through) dollars. They now limit adult basic education to literacy/basic skills/GED/ESL, and computer literacy.

I wish you well in your future endeavors. You may want to pursue independent options for writing "work-specific curriculum" or try obtaining employment in vocational/career technical education programs if you want to teach. I know you still work at Duffner. Whatever you do, I wish you the absolute best.

(*Id.* (emphasis in original).)

On November 3, 2000, plaintiff filed a complaint alleging defendants – Birmingham Board of Education, Brown, Sparks, Minor, and Cooley – violated his First Amendment rights by depriving him of "certain assignments" and terminating him in retaliation for "advocating for his students by exposing information and expressing opinions viewed by defendants as damaging to them." (Doc. 1, ¶ 1.)

### III. DISCUSSION

In order for plaintiff to establish that he was fired in retaliation for engaging in speech protected by the First Amendment, he must show: "(1) [His] speech [was] on a matter of public concern; (2) [his] First Amendment interest in engaging in the speech outweighs the [his] employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) [his] speech played a "substantial part" in [his] employer's decision to . . . discharge [him]." *Anderson v. Burke County*, 239 F.3d 1216, 1219 (11th Cir. 2001)(citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir.1989)). If plaintiff "succeeds in showing the preceding factors, the burden then shifts to

14

[his] employer to show, by a preponderance of the evidence, that "it would have reached the same decision . . . even in the absence of the protected conduct." *Id*. (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "The first two factors are questions of law designed to determine whether the First Amendment protects the employee's speech. The second two factors are questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech." *Id*. at 1219-20 (citing *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir.1995)). "Failure to establish any one of these . . . elements is fatal to Plaintiff's claim." *Mason v. Village of El Portal*, 240 F.3d 1337, 1339-40 (11th Cir. 2000).

The court finds that plaintiff cannot establish the second element of his claim – that is, plaintiff cannot establish that his interest in engaging in the speech at issue outweighs defendants' interest in prohibiting the speech. "In striking this balance, [the court] consider[s] these factors: '(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made.'" *Stanley v. City of Dalton*, 219 F.3d 1280, 1289 (quoting *Bryson*, 888 F.2d at 1567).

The fact that plaintiff's speech caused disruption is not disputed. Indeed, plaintiff's complaint alleges that he was terminated because of "the ***controversy*** caused by his revelations." (Doc. 1 ¶ 23 (emphasis added).) The court further finds that the Board and the other defendants have a strong interest in preventing disruption and that plaintiff's accusations of cheating adversely affected the Birmingham City School System, its students,

15

its teachers, and its administrators. *See Williams v. Alabama State University*, 102 F.3d 1179, 1183-84 (11th Cir. 1997); *Maples v. Martin*, 858 F.2d 1546, 1554 (11th Cir. 1988). The court finds that plaintiff's allegations of withdrawing students from the Birmingham City School system in order to raise standardized test scores impeded defendants from efficiently performing the service they provide to the public – the education of the children and adults within the City of Birmingham School System.

Moreover, the court finds that the record shows that plaintiff made his accusation with a reckless disregard for the truth; therefore, his interest in such statement does not outweigh defendants' interest in providing efficient services to the public. A recklessly false statement is not protected by the First Amendment. *Stanley*, 219 F.3d at 1290 n.18; *see also Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir.), *cert., denied* 515 U.S. 1161 (1995). When a statement is recklessly false, the court should consider "the actual damage done to the government by the reckless statement, whether anyone believed the statements, [and] whether the government could easily rebut the false statements" in determining whether the speaker's interest outweighs the government employer's interest. *Johnson*, 48 F.3d at 424 (citing *Pickering v. Board of Education*, 391 U.S. 563, 570-72 (1968)).

As set forth above, plaintiff accused the Birmingham School Board of involuntarily withdrawing "worthy" students in order to raise standardized test scores. His allegations were picked up by and printed in the newspaper. The allegation of manipulation of test scores was not easily disproved and three investigations, including one by the State Department of Education, were undertaken to disprove the allegation that students had been

withdrawn from high school in order to raise standardized test scores. These investigations showed the allegation was false and not supported by any records available to plaintiff. An examination of plaintiff's research for his paper shows a lack of any comprehensive effort to verify the premise of a paper submitted in the graduate level college course and that he made his unequivocal allegation of improper behavior based on an unreliably small sample of withdrawn students. Plaintiff admitted in his deposition that he did not attempt to verify the stories of the two students in his class from whom he received statements – he did not review records, and he did not interview school administrators, parents, or withdrawn students not enrolled in his adult education program. Moreover, in his brief to the court, he admits that he had "only anecdotal evidence of *possible* wrongdoing." (Pl's Brief at 5-6 (emphasis added).) Yet, he asserted, in an authoritative manner and in a purportedly scholarly forum, that principals had withdraw poor-performing students who wanted to remain in school to raise standardized test scores.

The court finds, as a matter of law, that plaintiff's statement was false and that he made this statement in a reckless manner. Therefore, plaintiff's statement was not protected by the First Amendment. Defendant's motion for summary judgment will be granted and plaintiff's claims dismissed with prejudice.

Having found plaintiff's statement was not protected speech, the court need not reach the remaining issues raised by defendant's motion for summary judgment. *See Mason*, 240 F.3d at 1339-40.

## IV. CONCLUSION

For all of the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law on all of plaintiff's claims.  An order granting defendants' motion for summary judgment (doc. 25) will be entered contemporaneously with this Memorandum Opinion.

DONE this   17th   day of March, 2003.

*Sharon Lovelace Blackburn*

**SHARON LOVELACE BLACKBURN**
United States District Judge

18